## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA

CASSANDRA WILKERSON, Heir at Law, and Representative of the Estate of GLENORA GARDNER,

        Plaintiff,

    vs.

ANGIODYNAMICS, INC., & NAVILYST MEDICAL, INC.,

        Defendants.

Case No.:

**COMPLAINT FOR DAMAGES**

  (1) NEGLIGENCE.
  (2) FAILURE TO WARN
  (3) DESIGN DEFECT
  (4) BREACH OF IMPLIED WARRANTY
  (5) BREACH OF EXPRESS WARRANTY
  (6) FRAUDULENT CONCEALMENT
  (7) WRONGFUL DEATH
  (8) SURVIVAL

**DEMAND FOR JURY TRIAL**

## COMPLAINT

COMES NOW the Plaintiff, Cassandra Wilkerson, (hereinafter "Plaintiff"), by and through her undersigned counsel, and brings this Complaint against AngioDynamics, Inc., and Navilyst Medical, Inc., (collectively, the "Defendants"), and alleges as follows:

1. This is an action for damages arising out of failures relating to Defendants' design, development, testing, assembling, manufacturing, packaging, promoting, marketing, distribution, supplying, and/or selling the defective implantable vascular access device sold under the trade name of SmartPort (hereinafter "SmartPort" or "Defective Device").

## PARTIES

– 1 –

2.      GLENORA GARDNER ("the Decedent" or "GLENORA GARDNER") was an adult citizen and resident of Leon County, Florida, who died on December 4, 2022.

3.      Plaintiff, CASSANDRA WILKERSON B is an adult resident and citizen of Harris County, Texas, and claims damages as set forth below.

4.      Defendant AngioDynamics, Inc. ("AngioDynamics") is a Delaware corporation with its principal place of business located in Latham, New York. AngioDynamics is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including the SmartPort.

5.      Defendant Navilyst Medical, Inc. ("Navilyst") is a Delaware corporation with its principal place of business located in Marlborough, Massachusetts. Navilyst conducts business throughout the United States, including the State of Florida, and is a wholly owned subsidiary of AngioDynamics. Navilyst is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices,

including the SmartPort.

## JURISDICTION AND VENUE

6.   This Court has subject matter jurisdiction over the parties pursuant to 28 U.S.C. §1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and cost.

7.   Venue is proper in this Court pursuant to 28 U.S.C. §1391 by virtue of the facts that (a) a substantial part of the events or omissions giving rise to the claims occurred in this District and (b) Defendants' products are produced, sold to, and consumed by individuals in the State of Florida, thereby subjecting Defendants to personal jurisdiction in this action and making them all "residents" of this judicial District.

8.   Defendants have and continue to conduct substantial business in the State of Florida and in this District, distribute vascular access products in this District, receive substantial compensation and profits from sales of vascular access products in this District, and made material omissions and misrepresentations and breaches of warranties in this District, so as to subject them to *in personam* jurisdiction in this District.

9.   Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments, this Court has *in personam* jurisdiction over

COMPLAINT

Defendants because Defendants are present in the State of Florida, such that requiring an appearance does not offend traditional notices of fair and substantial justice.

## PRODUCT BACKGROUND

9.    In or about 2007, a company called Rita Medical Systems, Inc. received clearance via the 510(k) Premarket Notification Program from the Food and Drug Administration (FDA) to market and sell a product called Vortex® CT Port Access System.

10.    Around the same time, Angiodynamics completed the acquisition of the assets and liabilities of Rita Medical Systems, Inc. and rebranded the subject product as SmartPort CT.

11.    Defendants' Vascular Access Devices were designed, patented, manufactured, labeled, marketed, sold, and distributed by the Defendants at all relevant times herein.

12.    The SmartPort is one of several varieties of port/catheter systems that has been designed, manufactured, marketed, and sold by Defendants.

13.    According to Defendants, the SmartPort is a totally implantable vascular access device designed to provide repeated access to the vascular system for the delivery of medication, intravenous fluids, parenteral nutrition solutions, and blood products.

– 4 –

COMPLAINT

14. The intended purpose of the SmartPort is to make it easier to deliver medications directly into the patient's bloodstream. The device is surgically placed completely under the skin and left implanted.

15. The SmartPort is a system consisting of two primary components: an injection port and a polyurethane catheter which includes additives intended to make it radiopaque.

16. The injection port has a raised center, or "septum," where the needle is inserted for delivery of the medication. The medication is carried from the port into the bloodstream through a small, flexible tube, called a catheter, that is inserted into a blood vessel.

17. The SmartPort is indicated for patient therapies requiring repeated access to the vascular system. The port system can be used for infusion of medications, I.V. fluids, parenteral nutrition solutions, blood products, and for the withdrawal of blood samples.

18. The product's catheter is comprised of a polymeric mixture of polyurethane and a barium sulfate radiopacity agent.

19. Barium sulfate is known to contribute to reduction of the mechanical integrity of polyurethane *in vivo* as the particles of barium sulfate dissociate from the surface of the catheter over time, leaving microfractures

– 5 –

COMPLAINT

and other alterations of the polymeric structure and degrading the mechanical properties of the polyurethane.

20.    Researchers have shown that catheter surface degradation in products featuring a radiopaque barium sulfate stripe is concentrated at the locus of the stripe.[1]

21.    The mechanical integrity of a barium sulfate-impregnated polyurethane is affected by the concentration of barium sulfate as well as the heterogeneity of the modified polymer.

22.    Upon information and belief, Defendants' manufacturing process in designing and constructing the catheter implanted in Decedent involved too high a concentration of barium sulfate particles for the polymer formulation, leading to improperly high viscosity of the admixed polyurethane before polymerization and causing improper mixing of barium sulfate particles within the polymer matrix.

23.    This defect in the manufacturing process led to a heterogeneous modified polymer which included weakened areas at the loci of higher barium sulfate concentration and led to fracture of the catheter.

---

[1] See Hecker JF, Scandrett LA. Roughness and thrombogenicity of the outer surfaces of intravascular catheters. *J Biomed Mater Res*. 1985;19(4):381-395. doi:10.1002/jbm.820190404

COMPLAINT

24. The roughened and otherwise compromised catheter surface also leads to the increased risk of the development of SmartPort related complications such as infection and thrombosis.

25. Although the surface degradation and resultant mechanical failure can be reduced or avoided with design modifications (*e.g.*, using a higher grade radiopacity compound and/or encapsulating the admixed polymer within an outer layer of pristine polymer), Defendants elected not to incorporate those design elements into the SmartPort.

26. At all times relevant, Defendants misrepresented the safety of the SmartPort system, and negligently designed, manufactured, prepared, compounded, assembled, processed, labeled, marketed, distributed, and sold the SmartPort system as safe and effective device to be surgically implanted to provide repeated access to the vascular system for the delivery of medications, intravenous fluids, parenteral nutrition solutions, and blood products.

27. Defendants obtained "clearance" to market these products under Section 510(k) of the Medical Device Amendments to the Food, Drug, and Cosmetic Act.

28. Section 510(k) permits the marketing of medical devices if the device is substantially equivalent to other legally marketed predicate devices without formal

review for the safety or efficacy of the device. The FDA explained the difference between the 510(k) process and the more rigorous "premarket approval" ("PMA") process in its amicus brief filed with the Third Circuit in *Horn v. Thoratec Corp.*, which the court quoted from:

> A manufacturer can obtain an FDA findings of 'substantial equivalence' by submitting a premarket notification to the agency in accordance with section 510(k) of the [Food Drug and Cosmetic Act.] 21 U.S.C. § 360(k). A device found to be 'substantially equivalent' to a predicate device is said to be 'cleared' by the FDA (as opposed to "approved' by the agency under a PMA.

376 F.3d 163, 167 (3d. Cir. 2004).

29.   A pre-market notification submitted under 510(k) is thus entirely different from a PMA, which must include data sufficient to demonstrate that the product involved is safe and effective.

30.   In *Medtronic, Inc.* v. Lohr, the U.S. Supreme Court similarly described the 510(k) process, observing:

> If the FDA concludes on the basis of the [manufacturer's] § 510(k) notification that the device is 'substantially equivalent' to a pre-existing device, it can be marketed without further regulatory analysis…. The § 510(k) notification process is by no means comparable to the PMA process; in contrast to the 1,200 hours necessary to complete a PMA review, the § 510(k) review is completed in average of 20 hours …. As one commentator noted: "The attraction of substantial equivalence to manufacturers is clear. Section 510(k) notification requires little information, rarely elicits a negative response form the FDA, and gets processed quickly.

518 U.S. 470, 478-79 (1996).

31.   Pursuant to *Wyeth v. Levine*, 555 U.S. 555 (2009), once a product is cleared "the manufacturer remains under an obligation to investigate and report any adverse associated with the drug…and must periodically submit any new

COMPLAINT

information that may affect the FDA's previous conclusions about the safety, effectiveness, or labeling ...." This obligation extends to post-market monitoring of adverse events/complaints.

32.    At all times relevant to this action, Defendants knew and had reason to know, that the SmartPort was not safe for the patients for whom they were prescribed and implanted, because once implanted the device was prone to fracturing, migrating, perforating internal vasculature, and otherwise malfunctioning.

33.    At all times relevant to this action, Defendants knew and had reason to know that patients implanted with a SmartPort port had an increased risk of suffering life threatening injuries, including but not limited to: death; infection; thrombosis; fracture; hemorrhage; cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart); cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; and perforations of tissue, vessels and organs, or the need for additional surgeries to remove the defective device.

34.    Soon after the SmartPort was introduced to market, which was years before Decedent was implanted with her device, Defendants began receiving large numbers of adverse event reports ("AERs") from health care providers reporting that the SmartPort was fracturing post-implantation and

that fractured pieces were migrating throughout the human body, including to the heart and lungs. Defendants also received large numbers of AERs reporting that the SmartPort was found to have perforated internal vasculature. These failures were often associated with reports of severe patient injuries such as:

 a. hemorrhage.

 b. cardiac/pericardial tamponade;

 c. cardiac arrhythmia and other symptoms similar to myocardial infarction;

 d. severe and persistent pain;

 e. perforations of tissue, vessels and organs; and

 f. upon information and belief, even death.

35. In addition to the large number of AERs which were known to Defendants and reflected in publicly accessible databases, there are many recorded device failures and/or injuries related to the Defendants' implantable port products which were concealed from medical professionals and patients through submission to the FDA's controversial Alternative Summary Reporting ("ASR") program.

36. The FDA halted the ASR program after its existence was exposed by a multi-part investigative piece, prompting a widespread outcry

from medical professionals and patient advocacy groups.[2]

37.     Prior to the discontinuation of the ASR program, Defendants reported numerous episodes of failures of their implanted port/catheter products – including numerous episodes of catheter related infection and thrombosis – under the ASR exemption, thereby concealing them from physicians and patients.

38.     Defendants were aware or should have been aware that the SmartPort had a substantially higher failure rate than other similar products on the market, yet Defendants failed to warn consumers of this fact.

39.     Defendants also intentionally concealed the severity of complications caused by the SmartPort and the likelihood of these events occurring.

40.     Rather than alter the design of the SmartPort to make it safer or adequately warn physicians of the dangers associated with the SmartPort, Defendants continued to actively and aggressively market the SmartPort as safe, despite their knowledge of numerous reports of catheter related infection and associated injuries.

41.     The conduct of Defendants, as alleged in this Complaint,

---

[2] Christina Jewett, *Hidden Harm: Hidden FDA Reports Detail Harm Caused by Scores of Medical Devices*, Kaiser Health News (Mar. 2019)

COMPLAINT

constitutes willful, wanton, gross, and outrageous corporate conduct that demonstrates a conscious disregard for the safety of Decedent and evidences malice, fraud, gross negligence, and oppressiveness. Defendants had actual knowledge of the dangers presented by the SmartPort System, yet consciously failed to act reasonably to:

a. Adequately inform or warn Decedent, her prescribing physicians, or the public at large of these dangers;

b. Establish and maintain an adequate quality and post-market surveillance system; or

c. Recall the SmartPort System from the market.

### SPECIFIC FACTUAL ALLEGATIONS AS TO DECEDENT

42. On or about August 3, 2022, Decedent underwent placement of the AngioDynamics SmartPort, reference number CT80LPPDVI, lot number 5732866. The device was implanted by Dr. Denise A. Smith, M.D., at Vascular Surgery Associates in Tallahassee, Florida, for the purpose of ongoing chemotherapy.

43. Defendant, directly or through their agents, apparent agents, servants, or employees designed, manufactured, marketed, advertised, distributed and sold the SmartPort that was implanted in Decedent.

44. Defendant manufactured, sold, and/or distributed the SmartPort

to Decedent, through her doctors, to be used for delivery of chemotherapy.

45. On or about November 13, 2022, Decedent presented to HCA FL Capital Hospital in Tallahassee, Florida, with complaints of chest pain and shortness of breath. Decedent was diagnosed with pleural effusion and an infection. Due to Decedent's positive blood cultures, her medical team determined that the defective port had to be removed and should not be replaced.

46. On or about November 18, 2022, Dr. Jeffrey Shepard Kirk, M.D., removed Decedent's defective port at HCA FL Capital Hospital.

47. At all times, the SmartPort was utilized and implanted in a manner foreseeable to Defendants, as Defendants generated the instructions for use and created procedures for implanting the product.

48. The SmartPort implanted in Decedent was in the same or substantially similar condition as when it left the possession of Defendants and in the condition directed by and expected by Defendants.

49. Decedent and her physicians foreseeably used and implanted the SmartPort and did not misuse or alter the SmartPort in an unforeseeable manner.

50. Defendants advertised, promoted, marketed, sold, and distributed the SmartPort as a safe medical device when Defendant knew or

COMPLAINT

should have known the SmartPort was not safe for its intended purposes and that the product could cause serious medical problems.

51.    Defendants had sole access to material facts concerning the defective nature of the SmartPort product and its propensity to cause serious and dangerous side effects.

52.    In reliance on Defendants' representations, Decedent's doctor was induced to and did use the SmartPort.

53.    As a result of having the SmartPort implanted, Decedent has experienced significant mental and physical pain and suffering, has sustained permanent injury, permanent and substantial physical deformity, has undergone corrective surgeries, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses.

54.    Defendants' SmartPort was marketed to the medical community and to patients as a safe, effective, reliable, medical devices implanted by safe and effective, minimally invasive surgical techniques for the treatment of medical conditions, and as safer and more effective as compared to the traditional products and procedures for treatment and other competing Vascular Access Devices.

55.    The Defendants have marketed and sold the Defendants' SmartPort to the medical community at large and patients through carefully

COMPLAINT

planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, direct to consumer advertising, aggressive marketing to health care providers at medical conferences, hospitals, private offices, and/or group purchasing organizations, and include a provision of valuable consideration and benefits to the aforementioned.

56.     The injuries, conditions, and complications suffered due to Defendants' SmartPort include but are not limited to hemorrhage; infection; thrombosis; fracture and migration; cardiac/pericardial tamponade; cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; perforations of tissue, vessels and organs; and even death.

57.     Defendants were negligent toward Decedent in the following respects:

a.  Defendant failed to design and establish a safe, effective procedure for removal of SmartPort; therefore, in the event of a failure, injury, or complications it is difficult to safely remove SmartPort.

b.  Defendants provided incomplete, insufficient, and misleading information to physicians in order to increase the number of physicians using SmartPort for the purpose of increasing their sales.  By so doing, Defendants caused the dissemination of inadequate and misleading information to patients, including the Decedent.

58.     The SmartPort was utilized and implanted in a manner foreseeable to Defendants.

COMPLAINT

59.    The SmartPort implanted into Decedent was in the same or substantially similar condition as when it left the possession of the Defendants and in the condition directed by the Defendants.

60.    At the time of her operation, Decedent was not informed of, and had no knowledge of the complaints, known complications, and risks associated with SmartPort, including but not limited to its propensity to cause infection and thrombosis.

61.    Decedent was never informed by Defendants of the defective and dangerous nature of SmartPort.

62.    At the time of her implant, neither Decedent nor Decedent's physicians were aware of the defective and dangerous condition of SmartPort.

63.    Decedent has suffered and will continue to suffer physical pain and mental anguish.

64.    Decedent has also incurred substantial medical bills due to the defective product that was implanted in her body.

## FIRST CAUSE OF ACTION
## NEGLIGENCE
(Against Defendants AngioDynamics and Navilyst)

65.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

66.    The Defendants owed Decedent a duty to exercise reasonable

– 16 –

COMPLAINT

care when designing, manufacturing, marketing, advertising, distributing, selling, and conducting post-market surveillance of the SmartPort.

67. The Defendants failed to exercise due care under the circumstances and therefore breached this duty by:

a. Failing to properly and thoroughly test the SmartPort before releasing the device to market, and/or failing to implement feasible safety improvements;

b. Failing to properly and thoroughly analyze the data resulting from any pre-market testing of the SmartPort;

c. Failing to conduct sufficient post-market testing and surveillance of the SmartPort;

d. Designing, manufacturing, marketing, advertising, distributing, and selling the SmartPort to consumers, including Decedent, without an adequate warning of the significant and dangerous risks of the SmartPort, including but not limited to, its propensity to cause infection and thrombosis, and without proper instructions to avoid the harm which could foreseeably occur as a result of using the device;

e. Failing to exercise due care when advertising and promoting the SmartPort; and

COMPLAINT

f. Negligently continuing to manufacture, market, advertise, and distribute the SmartPort after Defendants knew or should have known of its adverse effects.

68. As a direct, actual, and proximate cause of the Defendants' actions, omissions, and misrepresentations, the Decedent suffered injuries and sustained economic and non-economic damages, including pain and suffering and medical expenses. Accordingly, Plaintiff as heir and representative of the Decedent seeks compensatory damages.

69. In performing the foregoing acts, omissions, and misrepresentations, Defendants acted grossly negligent, fraudulently, and with malice so as to justify an award of punitive and/or exemplary damages.

## SECOND CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY – FAILURE TO WARN
(Against Defendants AngioDynamics and Navilyst)

70. Plaintiff incorporates the preceding paragraphs of the Product Background and Specific Allegations as to Decedent sections as if set out fully herein.

71. Defendants designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the SmartPort, including the one implanted into Decedent, into the stream of commerce and in the course of same, directly advertised and marketed the

– 18 –

device to consumers or persons responsible for consumers, and therefore had a duty to warn of the risk of harm associated with the use of the device and to provide adequate instructions on the safe and proper use of the device.

72.     At the time Defendants designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the device into the stream of commerce, the device was defective and presented a substantial danger to users of the product when put to its intended and reasonably anticipated use, namely as an implanted port/catheter system to administer the medications. Defendants failed to adequately warn of the device's known or reasonably scientifically knowable dangerous propensities and further failed to adequately provide instructions on the safe and proper use of the device.

73.     Defendants knew or should have known at the time they manufactured, labeled, distributed and sold the SmartPort that was implanted into Decedent that the SmartPort posed a significant and higher risk than other similar devices of device failure and resulting serious injuries.

74.     Defendants further knew that these devices were fracturing and migrating for reasons other than "pinch-off" caused by the physician's initial placement of the device.

75.     Defendants failed to timely and reasonably warn of material facts

– 19 –

regarding the safety and efficacy of the SmartPort; no reasonable health care provider, including Decedent's, and no reasonable patient would have used the device in the manner directed, had those facts been made known to the prescribing healthcare providers or the consumers of the device.

76. The warnings, labels, and instructions provided by the Defendants at all times relevant to this action, are and were inaccurate, intentionally misleading, and misinformed and misrepresented the risks and benefits and lack of safety and efficacy associated with the device.

77. The health risks associated with the device as described herein are of such a nature that ordinary consumers would not have readily recognized the potential harm.

78. The SmartPort, which was designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold into the stream of commerce by Defendants, was defective at the time of release into the stream of commerce due to inadequate warnings, labeling and/or instructions accompanying the product.

79. When Decedent was implanted with the device, Defendants failed to provide adequate warnings, instructions, or labels regarding the severity and extent of health risks posed by the device, as discussed herein.

80. Defendants intentionally underreported the number and nature of

– 20 –

COMPLAINT

adverse events associated with infection of the devices to Decedent's health care providers, as well as the FDA.

81. Neither Decedent nor her health care providers knew of the substantial danger associated with the intended and foreseeable use of the device as described herein.

82. Decedent and her health care providers used SmartPort in a normal, customary, intended, and foreseeable manner, namely as a surgically placed device used to make it easier to deliver medications directly into the patient's bloodstream. Moreover, Decedent's health care providers did not place or maintain the device incorrectly such that it caused the device to "pinch off" or otherwise malfunction.

83. Upon information and belief, the defective and dangerous condition of the device, including the one implanted into Decedent, existed at the time they were manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold by Defendants to distributors and/or healthcare professionals or organizations. Upon information and belief, the device implanted in Decedent was in the same condition as when it was manufactured, inspected, marketed, labeled, promoted, distributed and sold by Defendants.

84. Defendants' lack of sufficient warning and/or instructions was

COMPLAINT

the direct and proximate cause of Decedent's serious physical injuries, and economic damages in an amount to be determined at trial. In other words, had Defendants provided adequate warnings, Decedent and her physicians would not have used the device.

85.    As a direct, actual, and proximate cause of the Defendants' actions, omissions, and misrepresentations, the Decedent suffered injuries and sustained economic and non-economic damages, including for pain and suffering and medical expenses. Accordingly, Plaintiff as heir and representative of the Decedent seeks compensatory damages.

86.    In performing the foregoing acts, omissions, and misrepresentations, Defendants acted grossly negligent, fraudulently, and with malice.

**THIRD CAUSE OF ACTION**
**STRICT PRODUCTS LIABILITY – DESIGN DEFECT**
(Against Defendants AngioDynamics and Navilyst)

87.    Plaintiff incorporates the preceding paragraphs of the Product Background and Specific Allegations as to Decedent sections as if set out fully herein.

88.    Defendants supplied, manufactured, sold, distributed and/or otherwise placed into the stream of commerce the SmartPort implanted into the Decedent.

– 22 –

COMPLAINT

89. The SmartPort implanted in the Decedent was not reasonably safe for its intended use and was defective with respect to its design.

90. The SmartPort was in a defective condition and was defective in its design in that when it left the possession and control of Defendants, it was not safe for its anticipated use and safer, more reasonable alternative designs, existed that could have been utilized by Defendants.

91. The SmartPort was unreasonably dangerous to the user or consumer, taking into consideration the utility of said product and the risks involved in its use. The foreseeable risks associated with the design of the product were more dangerous than a reasonably prudent consumer such as the Decedent and/or her physicians would expect when the product was used for its normal and intended purpose.

92. The SmartPort was expected to and did reach the consumer without substantial change in the condition in which it was supplied, distributed, sold and/or otherwise placed into the stream of commerce.

93. A reasonably prudent medical device manufacturer would have recognized the defective design of the SmartPort and not placed it into the stream of commerce.

94. The design defects in the SmartPort were not known, knowable and/or reasonably apparent to the Decedent and/or her physician or

discoverable upon any reasonable examination.

95.    The SmartPort was used and implanted in the manner in which it was intended to be used and implanted by Defendants pursuant to the instructions for use and the product specifications provided by Defendants.

96.    Defendants are strictly liable for designing, manufacturing, marketing, labeling, packaging, and selling a defective product.

97.    As a direct, actual, and proximate cause of the Defendants' actions, omissions, and misrepresentations, the Decedent suffered injuries and sustained economic and non-economic damages, including for pain and suffering and medical expenses. Accordingly, Plaintiff as heir and representative of the Decedent seeks compensatory damages.

98.    In performing the foregoing acts, omissions, and misrepresentations, Defendants acted grossly negligent, fraudulently, and with malice.

**FOURTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY**
(Against Defendants AngioDynamics and Navilyst)

99.    Plaintiff incorporates preceding paragraphs of the Product Background and Specific Allegations as to Decedent sections as if set out fully herein.

100.    Defendants impliedly warranted that the SmartPort was

– 24 –

COMPLAINT

merchantable and fit for the ordinary purposes for which it was intended.

101. When the SmartPort was implanted in the Decedent, it was being used for the ordinary purposes for which it was intended.

102. When the SmartPort was implanted in the Decedent, it was being used for the ordinary purposes for which it was intended.

103. The Decedent, individually and/or by and through her physician, relied upon Defendants' implied warranties of merchantability in consenting to have the SmartPort implanted in her.

104. Privity exists between Decedent because Decedent's physicians acted as Decedent's purchasing agents in the subject transaction and/or because Decedent was a third-party beneficiary of the subject contract.

105. Decedent was the intended consumer of the device when Defendant made the warranties set forth herein, and such warranties were made to benefit Decedent as a patient and consumer.

106. Defendants breached these implied warranties of merchantability because the SmartPort implanted in Decedent was neither merchantable nor suited for its intended uses as warranted in that the device varied from its intended specifications, which included, but were not limited to, variances in the following respects:

    a. Defendants' manufacturing process in constructing the catheter

COMPLAINT

of the SmartPort implanted in Decedent involved too high of a concentration of barium sulfate particles for the polymer formulation, which led to improperly high viscosity of the admixed silicone before polymerization and causing improper mixing of barium sulfate particles within the polymer matrix;

b. Defendants' knew or should have known barium sulfate is known to contribute to a reduction in the mechanical integrity of the polyurethane in its product, the SmartPort, as the barium sulfate particles dissociate from the surface of the catheter over time; and

c. These defects led to a heterogenous modified polymer that included microfractures and weakened areas at the location of the higher barium sulfate concentration that ultimately led to fractures of the SmartPort and migration of catheter fragments.

107. Defendants' breaches of their implied warranties resulted in the implantation of unreasonably dangerous and defective SmartPort in the Decedent's body, placing said Decedent's health and safety in jeopardy.

108. The SmartPort was sold to the Decedent's health care providers for implantation in patients, such as Decedent.

109. As a direct, actual, and proximate cause of the Defendants'

COMPLAINT

actions, omissions, and misrepresentations, the Decedent suffered injuries and sustained economic and non-economic damages, including for pain and suffering and medical expenses. Accordingly, Plaintiff as heir and representative of the Decedent seeks compensatory damages.

110.    Upon information and belief, the Decedent's healthcare providers sent notice to Defendants of the adverse event that occurred to the Decedent and thus, the nonconformity of the SmartPort, within a reasonable period of time following discovery of the breach of warranty and before suit was filed.

## FIFTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY
(Against Defendants AngioDynamics and Navilyst)

111.    Plaintiff incorporates the preceding paragraphs of the Product Background and Specific Allegations as to Decedent sections as if set out fully herein.

112.    Defendants through their officers, directors, agents, representatives, and written literature and packaging, and written and media advertisement, expressly warranted that the SmartPort was safe and fit for use by consumers, was of merchantable quality, did not produce dangerous side effects, and was adequately tested and fit for its intended use.

113.    The SmartPort does not conform to the Defendants' express

– 27 –

representations because it is not reasonably safe, has numerous serious side effects, and causes severe and permanent injury.

114. At all relevant times, the SmartPort did not perform as safely as an ordinary consumer would expect, when used as intended or in a reasonably foreseeable manner.

115. Decedent, her physicians, and the medical community reasonably relied upon the Defendants' express warranties for the SmartPort.

116. Privity exists between Decedent because Decedent's physicians acted as Decedent's purchasing agents in the subject transaction and/or because Decedent was a third-party beneficiary of the subject contract.

117. Decedent was the intended consumer of the device when Defendant made the warranties set forth herein, and such warranties were made to benefit Decedent as a patient and consumer.

118. At all relevant times, the SmartPort was used on Decedent by Decedent's physicians for the purpose and in the manner intended by Defendants.

119. Decedent and Decedent's physicians, by the use of reasonable care, could not have discovered the breached warranty and realized its danger.

120. As a direct, actual, and proximate cause of the Defendants' actions, omissions, and misrepresentations, the Decedent suffered injuries and

COMPLAINT

sustained economic and non-economic damages, including for pain and suffering and medical expenses. Accordingly, Plaintiff as heir and representative of the Decedent seeks compensatory damages.

121. Upon information and belief, the Decedent's healthcare providers sent notice to Defendants of the adverse event that occurred to the Decedent and thus, the nonconformity of the SmartPort, within a reasonable period of time following discovery of the breach of warranty and before suit was filed.

### SIXTH CAUSE OF ACTION
### FRAUDULENT CONCEALMENT
(Against Defendants AngioDynamics and Navilyst)

122. Plaintiff incorporates the preceding paragraphs of the Product Background and Specific Allegations as to Decedent sections as if set out fully herein.

123. Defendants made false statements and representations to Decedent and her healthcare providers concerning the SmartPort product implanted in Decedent.

124. Defendants engaged in and fraudulently concealed information with respect to the SmartPort in the following particulars:

 a. Defendants represented through the labeling, advertising, marketing materials, seminar presentations, publications, notice

letters, and regulatory submissions that the SmartPort was safe and fraudulently withheld and concealed information about the substantial risks of using the SmartPort, including but not limited to, its heightened propensity to cause infection and thrombosis;

b. Defendants represented that the SmartPort was safer than other alternative systems and fraudulently concealed information which demonstrated that the SmartPort was not safer than alternatives available on the market;

c. Defendants concealed that it knew these devices were fracturing and migrating from causes other than the manner in which the implanting physician implanted the device;

d. Defendants knew that neither Medicare, Medicaid, nor most private insurance entities offer reimbursement for medical devices which aren't approved or cleared by the FDA; and

e. That frequency of these failures and the severity of injuries were substantially worse than had been reported.

125. Defendants had knowledge that the representations they made concerning the SmartPort, as stated above, were false.

126. Defendants had sole access to material facts concerning the dangers and unreasonable risks of the SmartPort.

– 30 –

COMPLAINT

127.   The concealment of information by the Defendants about the risks of the SmartPort was intentional.

128.   The concealment of information and the misrepresentations about the SmartPort was made by the Defendants with the intent that Decedent's health care providers and Decedent rely upon them.

129.   Decedent and her physicians relied upon the representations and were unaware of the regulatory status and the defective nature of the SmartPort which the Defendants concealed from the public, including Decedent and her physicians.

130.   As a direct, actual, and proximate cause of the Defendants' actions, omissions, and misrepresentations, Decedent suffered injuries and sustained economic and non-economic damages, including for pain and suffering and medical expenses. Accordingly, Plaintiff as heir and representative of Decedent seeks compensatory damages.

131.   The Defendants acted with oppression, fraud, and malice towards Decedent.

132.   Had Defendants not concealed this information, neither Decedent's nor her health care providers would have consented to using the device in Decedent.

133.   Upon information and belief, Decedent's healthcare providers

– 31 –

COMPLAINT

sent notice to Defendants of the adverse event that occurred to Decedent and thus, the nonconformity of the SmartPort, within a reasonable period of time following discovery of the breach of warranty and before suit was filed.

<b><u>SEVENTH CAUSE OF ACTION</u></b><br><b><u>WRONGFUL DEATH</u></b><br>(Against Defendants AngioDynamics and Navilyst)

134.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

135.    The Decedent's death was precipitated by the Defendants' Defective Port and by the Defendants' tortious conduct.

136.    The Decedent is no longer available to bring her own action to court.

137.    Plaintiff, who is the Decedent's surviving child, is the heir at law of the Decedent.

138.    Plaintiff suffered a loss because of the Decedent's death, as the Decedent was the Plaintiff's mother.

139.    Plaintiff has a right to recover the damages as follows, under § 768.21, Fla. Stat. Ann. for mental pain and suffering; for loss of parental companionship, instruction, and guidance; for funeral and medical expenses for the deceased; and for other applicable economic and non-economic damages.

– 32 –

COMPLAINT

**EIGHTH CAUSE OF ACTION**
**SURVIVAL**
(Against Defendants AngioDynamics and Navilyst)

140.   Plaintiff incorporates the preceding paragraphs as if set out fully herein.

141.   Under § 46.021, Fla. Stat. Ann., the causes of action for the injury to GLENORA GARDNER and for GLENORA GARDNER'S death, survived, and the action may be brought notwithstanding GLENORA GARDNER'S death.

142.   The causes of action for personal injury and wrongful death outlined in this Complaint survived to Plaintiff, who is GLENORA GARDNER's surviving child and her personal representative.

143.   The Plaintiff seeks damages on behalf of GLENORA GARDNER, as her surviving child, which GLENORA GARDNER could have claimed, and to which GLENORA GARDNER was entitled to, if she had survived, i.e., medical expenses, lost wages, and pain and suffering from the time of GLENORA GARDNER'S  injury until her death.

**PRAYER**

**WHEREFORE**, Plaintiff prays for judgment against each of the Defendants as follows:

   a.   Judgment be entered against all Defendant on all causes of

– 33 –

action of this Complaint;

b.  Plaintiff be awarded her full, fair, and complete recovery for all claims and causes of action relevant to this action;

c.  Plaintiff be awarded general damages according to proof at the time of trial;

d.  Plaintiff be awarded damages, including past, present, and future, medical expenses according to proof at the time of trial;

e.  Awarding pre-judgment and post-judgment interest to the Plaintiff;

f.  Awarding the costs and the expenses of this litigation to the Plaintiff.

g.  For such other and further relief as the court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues.

Respectfully submitted,

**RATZAN WEISSMAN & BOLDT**
2850 Tigertail Avenue, Suite 400
Coconut Grove, Florida 33133
Telephone: (305) 374-6366
eservice.legal@rwblawyers.com
mario@rwblawyers.com

– 34 –

COMPLAINT

/s/ Mario R. Giommoni

MARIO R. GIOMMONI
Florida Bar No. 97925
*ATTORNEY FOR PLAINTIFF*

COMPLAINT